**FLORIDA PUBLIC TELECOMMU-NICATIONS ASSOCIATION, INC., et al., Petitioners,**

v.

**FEDERAL COMMUNICATIONS COM-MISSION and United States of America, Respondents,**

**AT & T Corporation, et al., Intervenors.**

**Nos. 91–1486, 92–1356.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 14, 1995.

Decided May 23, 1995.

---

Robert F. Aldrich argued the cause, for petitioners, Florida Pay Telecommunications Ass'n, Inc. and American Public Communication Council, Inc. With him on the briefs were Albert H. Kramer and David B. Jeppsen. Bruce W. Renard entered an appearance, for petitioner Florida Public Telecommunications Ass'n, Inc.

Laurence N. Bourne, Counsel, F.C.C., argued the cause for respondents. With him on the brief were William E. Kennard, General Counsel, Daniel M. Armstrong, Associate General Counsel, and John E. Ingle, Deputy Associate General Counsel, F.C.C.; Anne K. Bingaman, Asst. Atty. Gen., Nancy C. Garrison and Catherine G. O'Sullivan, Attorneys, U.S. Dept. of Justice. Robert L. Pettit entered an appearance.

On the joint brief for intervenors were Mary J. Sisak, Frank W. Krogh and Donald J. Elardo, for MCI Telecommunications Corp.; H. Richard Juhnke for Sprint Corp.; Peter D. Keisler, Jonathan E. Nuechterlein, Mark C. Rosenblum and Robert J. McKee for AT & T Corp.; Danny E. Adams and Edward A. Yorgitis, Jr. for LDDS Communications, Inc. Diana J. Harter, Richard C. Hartgrove, Paul Walters and Durward D. Dupre entered appearances for intervenor Southwestern Bell Telephone Co. Martin T. McCue entered an appearance for intervenor U.S. Telephone Ass'n. Alfred W. Whittaker and Floyd S. Keene entered appearances for intervenor Ameritech Operating Companies. Marc E. Manly entered an appearance for intervenor AT & T Corp. Robert B. McKenna, Jr. entered an appearance for intervenor US West Communications, Inc. Stanley J. Moore, John W. Bogy, Margaret deB. Brown, James P. Tuthill and James L. Wurtz entered appearances for intervenors Pacific Bell and Nevada Bell. William B. Barfield and Matthew R. Sutherland entered appearances for intervenor BellSouth Telecommunications, Inc.

Before: BUCKLEY, WILLIAMS and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

This case turns on the meaning of one phrase in a subsection of the Telephone Operator Consumer Services Improvement Act of 1990 ("TOCSIA"). Section 226(e)(2) directs the Federal Communications Commis-

sion to

consider the need to prescribe compensation (other than advance payment by consumers) for owners of competitive public pay telephones *for calls routed to providers of operator services* that are other than the presubscribed provider of operator services for such telephones.

47 U.S.C. § 226(e)(2) (Supp.1993) (emphasis added). In the two orders under review here, the FCC ruled that this provision gives it authority to prescribe compensation only for *access-code* calls (including ones using the number 800), that is, phone calls directed initially to a carrier's "platform" (by dialing, for example, 10–ATT or 1–800–COLLECT), and then redirected under the caller's instructions to the party the caller wishes to reach. By contrast, the FCC ruled that *subscriber–800* calls, that is, calls to an 800 number assigned to a particular subscriber (for example, 1–800–FLOWERS or 1–800–USA–RAIL), go "through" a carrier preselected by the subscriber but not "to" a carrier, and thus do not fall within § 226(e)(2). See *Policies and Rules Concerning Operator Service Access and Pay Telephone Compensation,* 6 F.C.C.R. 4736, 4746 ¶ 36 (1991) (report, order and further notice of proposed rulemaking) ("*First Order*"); *Policies and Rules Concerning Operator Service Access and Pay Telephone Compensation,* 7 F.C.C.R. 4355, 4367 ¶ 50 (1992) (order on reconsideration) ("*Second Order*"). Several pay telephone owners, here represented by Florida Public Telecommunications Association, Inc. (formerly Florida Pay Telephone Association) and American Public Communications Council, Inc. contest this exclusion, arguing that the FCC's interpretation is contrary to the statute's plain language. We agree with the petitioners and therefore grant the petition, remanding to the Commission to "consider the need to prescribe compensation" for subscriber–800 calls.

\* \* \*

Because the FCC is charged with administering TOCSIA, our review is governed by *Chevron, Inc. v. NRDC,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), under which we make the familiar inquiry into "whether Congress has directly spoken to the precise question at issue", *id.* at 842, 104 S.Ct. at 2781, and, if not, into whether the agency's construction is "reasonable", *id.* at 840, 844–45, 866, 104 S.Ct. at 2780, 2782–83, 2793.

■ Section 226(e)(2) directs the Commission to consider requiring compensation "for calls routed to providers of operator services that are other than the presubscribed provider of operator services". Petitioners tell us, without contradiction by the Commission, that subscriber–800 calls, like access-code calls, are most often if not always carried by a "provider of operator services". Thus, if we read the words "routed to" as essentially the equivalent of "carried by", such subscriber–800 calls fall undeniably—plainly and unambiguously—within the statutory language.

The Commission, however, finds deeper meaning in the words "routed to". According to it, one may properly describe subscriber–800 calls as carried "by" or even routed "through" a provider of operator services; one cannot, however, say that such calls are routed "to" a provider of operator services because they do not—as access-code calls do—temporarily stop at the provider's platform for the caller to enter numbers indicating the final destination of the call, but rather are routed seamlessly *through* the provider to the subscriber. From the caller's perspective, the FCC claims, only access-code calls make a stop at the provider of operator services and thus only those calls are routed "to" a provider.

We find the FCC's parsing of the word "to" completely unconvincing. Whether we adopt the caller's or a technical point of view, we see no reasoned way to distinguish between the routing of access-code calls and of subscriber–800 calls. Technically, both access-code calls and subscriber–800 calls are routed "to" a provider, in the sense that both types of calls at some point in their journey switch from a local carrier "to" an interexchange operator services provider ("OSP"), which in both cases redirects the call "to" its final destination, the called party. Commission orders repeatedly use the phrase "routed to" to describe the portion of the path of a subscriber–800 call between the local exchange carrier and the interexchange carrier, despite the fact that the caller does not interact with the interexchange carrier at the

time of the switch. See, e.g., *Data Base Access Tariffs and the 800 Service Mgmt. Sys. Tariff,* 8 F.C.C.R. 5132, 5132 (1993) ("SCPs are data bases which contain routing instructions for 800 numbers, including identification of the IXC [inter-exchange carrier] *to* whom the call should be *routed.*... Upon receipt of the routing instructions, the SSP *routes* the call *to* the appropriate IXC.") (emphasis added); *Bell Atlantic Tel. Cos.,* 7 F.C.C.R. 2955, 2955 (1992) ("[L]ocal exchange carriers (LECs) identify the interexchange carrier (IXC) *to* which 800 calls should be *routed* by reading the three digits that immediately follow the 800 prefix of the dialed number....") (emphasis added); *Provision of Access for 800 Service,* 6 F.C.C.R. 5421, 5421 (1991) ("LECs must handle originating 800 access differently from originating access for ordinary interexchange calls because the LECs must *route* 800 calls *to* the carrier selected by the 800 service subscriber (the called party), rather than the carrier presubscribed to the originating line or chosen by the calling party.") (emphasis added). The fact that the caller is aware of the route of access-code calls and unaware of the route of subscriber–800 calls does not itself change the call's technical route.

Further, from the caller's perspective, neither type of call is a call "to" the provider of operator services. In both situations—as the FCC itself has stated in a different context—the caller perceives (and intends) the call as a single call, the ultimate destination of which is not the provider but a third party. See *Teleconnect Co. v. Bell Tel. Co.,* Nos. E–88–83 to E–88–103, 1995 WL 59773 ¶ 14 & n. 4 (8 F.C.C. Feb. 14, 1995) (noting that to the caller 800 access-code calls "appear to be a single call", "regardless of whether [the] caller must dial a second number at some point before the call is completed".); *id.* at ¶ 14 ("[F]rom the caller's point of view, any intermediate switching during the call is ... 'transparent'. [The caller] intends to make a single call terminating not at the ... intermediate switch, ... but at the telephone line of the called party."). One could, of course, interpret the word "to" in this context as requiring the call to end at the place following the word "to". That interpretation, however, would lead to a substantive result which

neither party suggests and for which we can divine no rationale: The Commission could prescribe compensation under § 226(e)(2) only for calls that end at a provider—a view that would probably embrace few or even no calls, depending on how such matters as billing inquiries are handled. Reading the contested phrase as referring to all calls that follow a path to or through a provider, by contrast, is perfectly consistent with both the ordinary meaning of the words and industry usage.

■ Of course we must read § 226(e)(2) in the context of the statute as a whole. But we see nothing in the other provisions of TOCSIA to convince us that Congress intended to give the words "routed to" the unusually restricted meaning the FCC proposes.

■ The Commission directs our attention to § 226(a)(1), which defines "access code" as "a sequence of numbers that, when dialed, connect the caller *to* the provider of operator services associated with that sequence." 47 U.S.C. § 226(a)(1) (emphasis added). From this the FCC expects us to conclude that the word "to" is reserved for access-code calls. But one cannot rationally conclude simply from the fact that one type of call (access-code) is routed *to* an OSP that another type (subscriber–800) is not. In fact, comparing § 226(e)(2) with other portions of the Act serves only to strengthen the impression that § 226(e)(2) was intended to cover more than simply access-code calls. The term "access code" appears throughout the statute, see §§ 226(a)(1), (a)(6), (a)(7)(B), (a)(8), (b)(E), (c)(B), (c)(C), (e)(1)(A), (e)(1)(B), but is noticeably absent from § 226(e)(2). If Congress had intended § 226(e)(2) to be limited to access-code calls, it would most likely have done so by using the carefully defined phrase "access code". The FCC's argument—that since most of the provisions of the Act explicitly deal only with access-code calls, this provision must do so as well—inverts the usual canon that when Congress uses different language in different sections of a statute, it does so intentionally. See *Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 300–01, 78 L.Ed.2d 17 (1983); see also *International*

*Union, UMWA v. MSHA,* 823 F.2d 608, 617–18 (D.C.Cir.1987).

The FCC makes a similar and, in our view, equally ironic argument from language in the Senate Report. See *First Order,* 6 F.C.C.R. at 4746; *Second Order,* 7 F.C.C.R. at 4367. That report describes § 226(e)(2) as requiring the Commission to "consider the need to prescribe compensation for independent pay phone owners for calls *made using a carrier-specific access code."* S.Rep. No. 439, 101st Cong., 1st Sess. 19 (1990), *reprinted in* 1990 U.S.C.C.A.N. 1577, 1595 (emphasis added). Therefore, the FCC argues, it is obvious that this is the language Congress intended to be in the statute. In fact, the report's entirely accurate statement that the section calls for consideration of compensation in one case (access codes) neither states nor even supports a strong inference that compensation in the subscriber–800 case is precluded. Descriptions of what a section accomplishes naturally tend to focus on the most salient effects; they do not carry a necessary implication that the effects noted are the only ones. See *Custis v. United States,* —— U.S. ——, ——, 114 S.Ct. 1732, 1741, 128 L.Ed.2d 517 (1994) (Souter, J., dissenting) (noting that the maxim that the inclusion of something necessarily implies the exclusion of something else falsely assumes that "all omissions in legislative drafting are deliberate, an assumption we know to be false.").

For what legislative history may be worth in this case, the House Report states a gloss quite close to petitioners' reading of the statute:

> [Section 226(e)(2) ] directs the Commission ... to consider the need to prescribe compensation (other than advance payment by consumers) to competitive payphone providers *for calls routed to carriers other than the provider of operator services designated by the competitive payphone provider.* Under the current system, the competitive payphone[ ] provider is compensated for calls routed to the designated provider of operator services by the carrier. However, when a consumer uses an interstate interexchange carrier's access code, such as 10XXX, 950–XXXX, or 800 number, to access the carrier from a com-

petitively provided payphone *or the call is otherwise routed to a carrier other than the designated provider of operator services,* the owner of the phone typically receives no compensation.

H.R.Rep. No. 213, 101st Cong., 1st Sess. 13 (1989) (emphasis added). We will not use contestable negative inferences from one part of the legislative history to trump the plain words of the statute. See *Gemsco v. Walling,* 324 U.S. 244, 260 (1945).

Nor do the Act's overall structure and purpose suggest an intent to exclude subscriber–800 calls from consideration under § 226(e)(2). Congress's primary purpose in enacting TOCSIA, the FCC reminds us, was to respond to consumer (i.e., caller) complaints that independent pay phone owners were blocking caller access to OSPs other than the presubscribed one and that presubscribed OSPs were charging excessive rates to callers. See TOCSIA, Pub.Law No. 101–435, 104 Stat. 986 § 2(10) (1990). Because of this concern for consumers, Congress ordered pay phone providers to "unblock" 800 and 950 access-code numbers so that the consumer could obtain from any pay phone "access to the provider of operator services desired by the consumer"; and it ordered the FCC to hold a rulemaking proceeding to prescribe regulations to "protect consumers from unfair and deceptive practices" and to "ensure that consumers have the opportunity to make informed choices" in making long-distance phone calls. See 47 U.S.C. §§ 226(c)(1)(B), 226(d)(1). These provisions apply only to calls that the caller pays for—that is, access-code calls—not to subscriber–800 calls, which are paid for by the called party. The FCC insists that the fact that the unblocking provisions apply only to access-code calls provides evidence that Congress's sole concern in TOCSIA was to protect consumers; since subscriber–800 calls are not billed to the consumer, they were not included in the unblocking provisions and should not be thought to have been included in the compensation provision either. Further, the FCC says, to interpret § 226(e)(2) according to what we have found to be its plain meaning creates an asymmetry—giving the Commission authority to prescribe com-

862

pensation not only for calls that are required to be unblocked, but also for ones that remain blockable.

Both of these arguments fall flat. It is true that most of TOCSIA's provisions are designed to protect consumers from being fleeced by the concerted action of pay phone owners and presubscribed providers of operator services; we have no doubt that much of the legislative history describes that intent. But § 226(e)(2) is obviously not designed to protect consumers directly—though it might do so indirectly by improving firms' incentives to offer competitive pay telephones. Its primary purpose is to protect pay phone owners, presumably from being fleeced by "providers of operator services that are other than the presubscribed provider". Congress does not have to act—indeed rarely does act—with a single overriding purpose. Here it intended "to assure fairness for consumers and service providers alike". TOCSIA § 2(2); see also H.Rep. No. 213, at 1 (TOCSIA bill designed "to require the [FCC] to prescribe rules to protect consumers from unfair practices in the provision of operator services, *and for other purposes*") (emphasis added). While § 226(e)(2) may not directly further the purpose of protecting consumers, it does further the purpose of protecting service providers (in this case, competitive public pay phone owners).

Finally, even if the supposed asymmetry between the provisions for unblocking and for compensation were not amply understandable by virtue of their differing purposes, it is offset by Congress's explicit decision to make unblocking mandatory but prescription of compensation discretionary. Section 226(e)(2) does not order the FCC to prescribe compensation for all the calls to which it refers, only to "consider the need" to prescribe compensation. The Commission may decide that some important policy consideration justifies prescribing compensation only for the calls that Congress ordered unblocked; in that case, the FCC's findings will support a parallelism that it assumes here.

Having found nothing in the text, structure, or legislative history of TOCSIA that throws doubt on the plain meaning of the words "routed to" as used in § 226(e)(2), we reverse and remand the case to the Commission to "consider the need to prescribe compensation" for subscriber–800 calls "routed to providers of operator services that are other than the presubscribed provider of operator services".

*So ordered.*