# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 21, 2004          Decided June 28, 2005

No. 04-7034

APCC SERVICES, INC., ET AL.,
APPELLEES

v.

SPRINT COMMUNICATIONS CO.,
APPELLANT

———

Consolidated with
04-7035

———

Appeals from the United States District Court
for the District of Columbia
(No. 01cv00642)
(No. 99cv00696)

———

*David P. Murray* and *Edward P. Lazarus* argued the cause for appellants. With them on the briefs were *Randy J. Branitsky* and *Jeffrey P. Kehne*. *Clifford J. Zatz* entered an appearance.

*Roy T. Englert, Jr.* argued the cause for appellees. With him on the brief were *Donald J. Russell* and *Michael W. Ward*. *Alyssa M. Campbell*, *Charles B. Montgomery*, *Jeffrey J. Ward*, *Sean M. Hanifin*, *Adam Proujansky*, *Albert H. Kramer*, *Leon B. Kellner* and *Leslie R. Cohen* entered appearances.

*Joel Marcus*, Counsel, Federal Communications Commission, argued the cause as *amicus curiae* in support of appellees. On the brief were *John A. Rogovin*, General Counsel, *Austin C. Schlick*, Deputy General Counsel, *John E. Ingle*, Deputy Associate General Counsel, and *Laurence N. Bourne*, Counsel.

Before: GINSBURG, *Chief Judge*, and SENTELLE and RANDOLPH, *Circuit Judges*.

Opinion for the Court filed PER CURIAM.[*]

Opinion dissenting in part filed by *Circuit Judge* SENTELLE.

Dissenting opinion filed by *Chief Judge* GINSBURG.

PER CURIAM: In these consolidated appeals, we consider whether chapter 5 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151–615b, creates a private right of action for an owner or operator of a payphone (hereinafter a payphone service provider, or a PSP) to recover from an interexchange carrier (IXC) the compensation for coinless payphone calls required by a regulation of the Federal Communications Commission. Before answering that question, however, we must first decide whether the plaintiffs, as the assignees of PSPs' claims against the IXCs, have standing to sue

---

[*] *Chief Judge* GINSBURG wrote Sections I, II.A, II.B.1, II.B.3 and *Circuit Judge* RANDOLPH wrote Section II.B.2 of the opinion for the court. *Circuit Judge* SENTELLE dissents from Section II.A with respect to the standing of the plaintiff aggregators but concurs in the judgment. *Chief Judge* GINSBURG dissents from Section II.B.2 and from the judgment.

them. We conclude the plaintiffs do have standing but the Act does not provide them a right to sue in federal court.

## I. Background

In 1990 the Congress enacted the Telephone Operator Consumer Services Improvement Act, Pub. L. No. 101-435, 104 Stat. 986 (codified at 47 U.S.C. § 226), which requires PSPs to allow consumers to use an access code (e.g., "10-10-220") or a subscriber 800 number to make a call from a payphone. *See* 47 U.S.C. § 226(c)(1)(B). Before then, many PSPs had blocked the use of access codes and 800 numbers because they enabled customers to "dial around" the PSP's preselected IXC, with the result that neither the IXC nor the PSP received any payment for the call.

In its initial implementation of the Act, the Commission required IXCs to compensate PSPs only for access code calls, not for calls to subscriber 800 numbers, *see Policies and Rules Concerning Operator Services Access and Pay Telephone Compensation*, 6 F.C.C.R. 4736 ¶¶ 34, 36 (1991), *clarified on recons.*, 7 F.C.C.R. 4355 ¶ 50 (1992), but we held that compensation scheme was not fully consistent with the 1934 Act, 47 U.S.C. § 226(e)(2), and had to be reconsidered. *Fla. Pub. Telecomms. Ass'n, Inc. v. FCC*, 54 F.3d 857, 859 (D.C. Cir. 1995). Then, in the Telecommunications Act of 1996, the Congress instructed the Commission to devise a new plan that would "ensure that all payphone service providers are fairly compensated for each and every completed intrastate and interstate call using their payphone[s]." 47 U.S.C. § 276(b)(1)(A). After several failed attempts, *see Ill. Pub. Telecomms Ass'n v. FCC*, 117 F.3d 555, 558 (D.C. Cir. 1997) and *MCI Telecomms. Corp. v. FCC*, 143 F.3d 606, 607 (D.C. Cir. 1998), the Commission finally crafted such a plan. *See Am.*

*Pub. Communications Council v. FCC*, 215 F.3d 51, 52 (D.C. Cir. 2000) (upholding the plan). Getting the Commission to enact a regulation requiring IXCs to compensate them for dial-around calls was only half the battle for the PSPs, however; their challenge now is to collect.

Most PSPs rely upon "aggregators" to act as intermediaries between themselves and the several IXCs; an aggregator acting on behalf of a PSP submits billing information to the IXCs and pays over to the PSP the monies it receives from the IXCs. The aggregator charges the PSP a fee based upon the number of telephone lines that PSP operates. Plaintiff American Public Communications Council Services (APCCS) is the largest aggregator, representing more than 1400 PSPs, which in turn own and operate more than 400,000 payphones nationwide.

APCCS and several other plaintiff aggregators represent that certain IXCs "have failed to pay the required [dial-around] compensation for millions of calls placed over several years." They sought authorization from their client PSPs to sue IXCs on the PSPs' behalf, and agreed to pass back to the PSPs any amounts they recovered thereby. Each PSP then signed an "Assignment and Power of Attorney" providing, in relevant part, that the PSP

> assigns, transfers, and sets over to [the aggregator] for purposes of collection all rights, title and interest of the [PSP] in the [PSP's] claims, demands or causes of action for "Dial-Around Compensation" ("DAC") due the [PSP] for periods since October 1, 1997, pursuant to Federal Communications Commission rules, regulations and orders.

The aggregators, purporting to act "as assignee[s] of the claims of and attorney[s]-in-fact" for the PSPs, then jointly filed lawsuits against Sprint, AT&T, and other IXCs, claiming each

5

IXC had violated the Commission's dial-around compensation regulation. One PSP, Peoples Telephone Company, also participated in the lawsuits as a co-plaintiff.

AT&T moved to dismiss the cases on the ground the aggregators lacked standing to sue. The district court initially agreed and dismissed all the claims of the aggregators, *APCCS v. AT&T Corp.*, 254 F. Supp. 2d 135, 137 (D.D.C. 2003), but upon the aggregators' motion for reconsideration, vacated its earlier ruling and denied AT&T's motion. 281 F. Supp. 2d 41, 45 (D.D.C. 2003).

Another IXC, Cable & Wireless, moved to dismiss the single complaint against it on the grounds that the aggregators lacked not only standing but also a right of action for dial-around compensation under § 276 of the Act and the implementing regulation promulgated by the Commission. The district court denied that motion and permitted the plaintiffs to amend their complaints to assert that §§ 201(b), 407, and 416(c) of Title 47 provide alternative grounds for relief. *APCCS v. Cable & Wireless, Inc.*, 281 F. Supp. 2d 52, 57 (D.D.C. 2003). (Cable & Wireless thereafter filed for bankruptcy and the case against it was stayed.) At the instance of Sprint and AT&T, the district court then certified its orders for interlocutory appeal, *APCCS v. Sprint Communications Co.*, 297 F. Supp. 2d 90, 101 (D.D.C. 2003); *APCCS v. AT&T Corp.*, 297 F. Supp. 2d 101, 110 (D.D.C. 2003), and we consolidated their appeals.

## II. Analysis

Our review is *de novo*. We assume the factual allegations in the complaints are true. *See Greene v. Dalton*, 164 F.3d 671, 674 (D.C. Cir. 1999). Because Article III standing is a jurisdictional requirement, we begin our analysis there. *See*

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–102 (1998).

A.  The Aggregators' Standing

Sprint and AT&T argue the aggregators lack standing to sue because they do not have "a concrete personal stake in the litigation."  As these IXCs see things, the aggregators' "skeletal and conditional" assignments from the PSPs are insufficient to confer standing because they transfer only "bare legal title" to the claims of the PSPs, that is, the right to sue "for purposes of collection" but not the right to the recovery.  Here the IXCs point out that the aggregators have promised to return to the PSPs all the proceeds from the litigation.[*]  Further, they contend the assignments, notwithstanding their terms, are in fact "completely revocable" by the PSPs.

In terms of the "irreducible constitutional minimum" requirements for standing — injury-in-fact, causation, and redressability, *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) — the IXCs first argue the aggregators have not suffered any injury of their own, and the assignments do not confer upon the aggregators the right to assert the injury of the PSPs.  The IXCs also argue the relief the aggregators seek

---

[*] Even if the IXCs are correct that the aggregators do not have standing as assignees, we note that Peoples Telephone Company, a PSP, and two aggregators, Jaroth, Inc. and NSC Telemanagement, would still have standing. Jaroth contends it owned a 17% interest in a PSP at the time the lawsuit was filed, and NSC contends it will receive 10% of any compensation it collects on behalf of an affiliated PSP.  Part II.A, therefore, deals with the standing only of those aggregators whose interest in the lawsuit stems solely from an assignment.

would not redress their purported injury because the aggregators would not keep any portion of such damages as may be awarded.

There are some circumstances in which a plaintiff has standing to sue based upon an injury to someone else. Indeed, in *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 773 (2000), the Supreme Court stated in no uncertain terms that "the assignee of a claim has standing to assert the injury in fact suffered by the assignor." At the same time, however, the Court said that the assignee must have a "concrete private interest in the outcome of the suit" that is related to the injury asserted. *Id*. at 772.

Therefore, in order to determine whether the aggregators have standing, we must first determine the effect of the assignments, which purport to transfer to them "all rights, title and interest" in the PSPs' dial-around compensation claims. We must then determine whether the aggregators have a stake in the outcome of the suit, notwithstanding their contractual obligation to account to the PSPs for any award of damages.

1. The assignments

Sprint and AT&T offer two reasons to believe the assignments did not transfer the PSPs' compensation claims to the aggregators so as to give the aggregators standing to sue. First, the transferred ownership interest was only "for purposes of collection." Second, the assignments were "completely revocable" by the PSPs.

We need not dwell upon the IXCs' first argument. The quoted phrase appears in the following context: "[The PSP] hereby assigns, transfers and sets over to [the aggregator] for

purposes of collection all rights, title and interest of [the PSP] in [the PSP's] claims, demands or causes of action" for dial-around compensation. The phrase "for purposes of collection," which the IXCs portray as a fatal limitation, we think a mere reflection of the aggregator's promise to pass back to the PSP whatever it is able to collect. Whether that obligation affects the aggregator's standing is a distinct question, which we consider in Part II.A.2 below, but it certainly does not affect the validity of the assignment of the PSP's dial-around compensation claim. The IXCs, therefore, give us no reason to believe the assignment is anything less than a complete transfer to the aggregator of the PSP's dial-around compensation claim.

Equally unavailing is the IXCs' contention that the assignments are "completely revocable." By their terms, the assignments "may not be revoked without the written consent of [the aggregator ]." Sprint and AT&T suggest the court should treat this provision as a mere "formality," because APCCS sent to each of its client PSPs a letter stating: "If at any point APCCS is no longer representing you in the litigation, you will be able to pursue your claims on your own, should you so choose." The possibility that APCCS would no longer represent a PSP in litigation does nothing, however, to suggest the PSP could revoke the assignment as long as APCCS continues to represent the PSP in the litigation. Of course, APCCS itself could repudiate the assignment and presumably would do so if it no longer wanted to represent the PSP in the litigation. In any event, the assignment itself is plain: the PSP may not revoke it without the consent of the aggregator.

Having rejected both the IXCs' arguments challenging the effect of the assignments, we turn to the question whether the aggregators' promise to pass along the proceeds of litigation affects their standing to sue.

2.   Pass back of the proceeds

Sprint and AT&T also argue the aggregators lack standing because the assignments effectively give them only the right to sue; the aggregators will reap no direct financial benefit from the suit.  In that respect, Sprint and AT&T argue, the interest of the aggregators in this case is unlike that of a *qui tam* relator, whose standing the Supreme Court upheld in *Vermont Agency*, 529 U.S. 765.  Here, the IXCs argue, the aggregators retain "no genuine economic interest" in the dial-around compensation claims as a result of their promises to pay the proceeds to the PSPs, whereas a *qui tam* relator benefits from the bounty he receives if his claim is successful.  *Id.* at 772.

According to the IXCs, this case is better compared to *Connecticut v. Physicians Health Services of Connecticut, Inc.*, 287 F.3d 110 (2002), in which the Second Circuit held that the State of Connecticut lacked standing to assert claims against an insurance company offering managed care plans to Connecticut residents.  The State claimed standing on the ground that several plan participants had assigned to the State their right to seek "appropriate equitable relief with respect to any cause of action they may have as plan participants or beneficiaries."  *Id.* at 112.  The Second Circuit concluded that Connecticut did not have a "concrete private interest in the outcome of the suit" because "[n]one of the remedies being sought would flow to the State as assignee."  *Id.* at 118.  The assignments at issue did not "confer 'actual' rights or benefits ... on the State.  The right to recover benefits or to seek money damages remain[ed] with the assignor."  *Id.* at 115.  Therefore, the court held that, "[e]ven if the assignments are valid as a contractual matter, they ... merely give the State the right to act as a nominal party."  *Id.* at 118.

The assignments at issue here, in contrast, transfer to the assignees the entire interest of the PSPs in their dial-around

compensation claims, and, as explained in Part II.A.1 above, there is nothing to suggest the assignments were invalid. As for the question that remains — whether the aggregators' promise to hand over any recovery to the PSPs means the aggregators have no stake in the case — *Physicians Health* is not helpful; it did not address the question whether an assignee that would otherwise have standing to sue loses its standing when it obligates itself to give the proceeds of the suit to another.

Still, we are not entirely without guidance. As the district court observed, the identical issue has arisen under Federal Rule of Civil Procedure 17(a): "Every action shall be prosecuted in the name of the real party in interest." Courts and commentators agree that, if an assignment properly transfers ownership of a claim, then the assignee's interest "is not affected by the parties' additional agreement that the transferee will be obligated to account for the proceeds of a suit brought on the claim." *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 17 (2d Cir. 1997); *see also Titus v. Wallick*, 306 U.S. 282, 289 (1939) (legal effect of assignment "was not curtailed by the recital that the assignment was for purposes of suit and that its proceeds were to be turned over or accounted for to another"); JAMES WM. MOORE, ET AL., MOORE'S FEDERAL PRACTICE § 17.11[1][c] (3d ed. 1997) ("The assignee is real party in interest even though assignee must account to the assignor"); 6A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FED. PRAC. & PROC. § 1545 at 348 (1990) ("[F]ederal courts have held that an assignee for purposes of collection who holds legal title to the debt ... is a real party in interest even though the assignee must account to the assignor for whatever is recovered in the action").

Sprint and AT&T counter with the observation that Rule 17(a) and the requirement of standing "are governed by different standards and serve distinct purposes." That is true enough, as

far as it goes: Standing depends in part upon elements "clearly unrelated to the rather simple proposition set out in Rule 17(a)," FED. PRAC. & PROC. § 1542 at 330. But standing also depends in part, as does a plaintiff's status as the real party in interest, upon having "a personal interest in the controversy," *Whelan v. Abell*, 953 F.2d 663, 672 (D.C. Cir. 1992), and that is the only requirement at issue in the IXCs' challenge to the aggregators' standing in this case.

We see no basis for distinguishing the personal stake required under Rule 17(a) from the interest required for standing. What the aggregators have promised to do with any recovery is irrelevant to their standing — as it would be to their status as real parties in interest. We need only be satisfied that the aggregators received a valid assignment of the claims, so that any damage award will be payable to them in the first instance. Upon that score the IXCs have cast no doubt.[*]

B. Private Right of Action

Sprint and AT&T contend that nothing in chapter 5 of the Communications Act authorizes a PSP to sue an IXC for failure to pay the dial-around compensation required by the regulation the Commission promulgated to implement § 276. In determining whether the Act creates a private right of action, the court's task is straightforward: We must "interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy," for

---

[*] Because we conclude the aggregators have standing as assignees, we need not consider their alternative claim, which is that they have associational standing. *See Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 344 (1977); *Fund Democracy, LLC v. SEC*, 278 F.3d 21, 25 (D.C. Cir. 2002).

"private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001).

    1.    Section 276

Section 276(b)(1) provides in relevant part:

In order to promote competition among payphone service providers and promote the widespread deployment of payphone services to the benefit of the general public ... the Commission shall ... prescribe regulations that—

(A) establish a per call compensation plan to ensure that all payphone service providers are fairly compensated for each and every completed intrastate and interstate call using their payphone.

As the plaintiffs acknowledge, § 276 itself does not create a private right of action; nor does it hold a common carrier liable for failing to comply with the requirements of the Act. According to the plaintiffs, however, those gaps are filed by §§ 206 and 207, respectively.

Section 206 provides in relevant part:

In case any common carrier shall do, or cause or permit to be done, any act, matter, or thing in [chapter 5] prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in [chapter 5] required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of [chapter 5].

And § 207 provides in relevant part:

> Any person claiming to be damaged by any common carrier subject to the provisions of [chapter 5] ... may bring suit for the recovery of the damages for which such common carrier may be liable under the provisions of [chapter 5], in any district court of the United States of competent jurisdiction.

The question, then, is this: According to the allegations of the complaint, did Sprint and AT&T, which are common carriers, do something made unlawful by, or fail to do something required by, § 276? If so, then § 206 makes them liable to any person injured as a result, and § 207 permits "any person claiming to be damaged" to sue them in federal court.

The district court reasoned that § 276(b)(1)(A) "confers upon PSPs a right to be 'fairly compensated,'" while the Commission's regulation "provides the details necessary to implement" that statutory right — namely, who must compensate the PSPs, and by how much. 281 F. Supp. at 56. According to the district court, the regulation "implements the Congressional mandate ... by specifying what it means to be 'fairly compensated'; as such, when a common carrier violates the regulation, it is effectively doing something 'declared to be unlawful' within the meaning of section 206 and is therefore subject to suit under section 207." *Id*.

In *Greene v. Sprint Communications Co.*, 340 F.3d 1047 (2003), another case brought by aggregators against IXCs on behalf of PSPs, the Ninth Circuit read the same statute quite differently. That court first observed that § 276 "does not establish a *right* to compensation, or to compensation by *IXCs*. The statute does not say 'PSPs shall be entitled to fair compensation,' or 'IXCs shall pay PSPs.'" Viewing the "lack

of rights-creating language in § 276 [as] crucial," the court held that, when an IXC fails to pay a PSP the compensation prescribed by the Commission, "there is no violation of the Act to be remedied through the private right of action afforded by §§ 206 and 207." *Id*. at 1050–52.

We join the Ninth Circuit in holding that § 276 does not create a right of action for a PSP (or its assignee) to recover dial-around compensation from an IXC. As our sister circuit observed, the Supreme Court in *Sandoval* held that § 602 of Title VI of the Civil Rights Act, 42 U.S.C. § 2000d-1, did not reflect an intent on the part of the Congress to create a private right of action specifically because there was no "rights-creating language" in the statute. 532 U.S. at 288. The same is true of § 276 of the Communications Act. That section is by its terms addressed neither to the rights of PSPs nor to the obligations of IXCs. Rather, it is "yet a step further removed: It focuses ... on the agenc[y] that will do the regulating." *Id*. Section 276 is addressed only to "the Commission," which it directs to "take all actions necessary ... to ensure that all [PSPs] are fairly compensated" for the calls they originate.

Nothing in the statute requires the Commission to designate the IXC as the party responsible for dial-around payment. Indeed, as the IXCs note, the Commission identified the caller and the recipient as possible payors, and in fact it considered a "caller pays" scheme before eventually concluding that a "carrier pays" scheme was more practical. *See* Notice of Proposed Rulemaking, *Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, 11 F.C.C.R. 6716 ¶ 24 (1996); *see also Greene*, 340 F.3d at 1051 n.3 (discussing alternative schemes the Commission considered).

Because the IXCs are not regulated by § 276, there is no way in which they could have violated that provision. They may have violated a regulation implementing § 276, but § 206 makes a common carrier liable only for violating chapter 5 itself — not for a violating a regulation issued by the Commission pursuant to chapter 5. Because it is not a violation of § 276 for an IXC to fail to pay dial-around compensation to a PSP, the plaintiffs do not have a right of action, based upon that section, against the IXCs.

2. Section 201(b)

Plaintiffs contend that even if they cannot rely on § 276, a common carrier's failure to comply with the Commission's regulations violates § 201(b) of the Act, which in turn triggers the provisions (§§ 206 and 207) allowing suit in federal court. Section 201(b) provides that any "charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful." A common carrier's failure to compensate PSPs for dial-around calls, plaintiffs argue, is a "practice" that is "unjust or unreasonable," and therefore "unlawful" under the Act.

At the heart of plaintiffs' argument is the notion that it is inherently an unreasonable practice, within the meaning of § 201(b), to violate a Commission regulation. That reading would transform § 201(b) into a catchall provision, converting any common carrier's violation of a Commission order or regulation into a violation of the Act actionable in federal court. This result is not plainly evident from the text of the Act, and nothing suggests that Congress intended its words to have such a sweeping effect.

It is important to keep in mind that the question here is not so much whether there is a private right of action, but where --

directly in district court, or in the Commission. This is different from *Sandoval*, in which the alternative to a right of action in court was no action anywhere. Still *Sandoval* has something to say about the issue facing us, if only in dicta: "[W]hen a statute has provided a general authorization for private enforcement of regulations, it may perhaps be correct that the intent displayed in each regulation can determine whether or not it is privately enforceable." 532 U.S. at 291.

Here, the body of the FCC's 1999 "Order" said not a word about § 201(b). All we see is boilerplate in the ordering clause, and in the clause identifying the authority for Part 64 of the rules, citing a list of sections including "201." (This is in marked contrast to the treatment of § 276, which the Commission mentioned throughout as the source of its authority.) It cannot be that the mere citation of § 201 displays -- in *Sandoval*'s words -- an intent that the regulation setting the compensation level should be privately enforceable in court. Still less can it be that the mere citation of § 201 is entitled to *Chevron* deference as the agency's authoritative interpretation of § 201(b). The dissent's quotation of the following statement from *Sandoval* is therefore inapposite: a "Congress that intends the statute to be enforced through a private cause of action intends the authoritative interpretation of the statute to be so enforced as well." 532 U.S. at 284. There was no authoritative interpretation of § 201(b) in this case. For all we know, the Commission in 1999 never even thought about suits directly in district court. Certainly the body of the Order itself gave no clue that it did so. In fact, in some of the paragraphs talking about the PSPs compensating the carriers for overpayments, the assumption appears to be that collection actions will be before the Commission (as indeed they must be in an any action by a carrier against a PSP for not making a refund). *See, e.g., In re Implementation of the Pay Telephone Reclassification and*

*Compensation Provisions of the Telecommunications Act of 1996,* 14 F.C.C.R. 2545 ¶¶ 195-99 (1999).

A court should be reluctant to put words in the Commission's mouth -- here, the words "unjust and unreasonable." The Commission never, in its 1999 Order, specified that a carrier's failure to pay was of this magnitude. Given the potential consequences to judicial dockets of the Commission's making that finding, we should require a clear statement (and analysis) by the agency. What the Commission meant by citing § 201 at the end of its Order is anyone's guess. If the Order itself indicated that the Commission expected payphone providers to be able to collect in judicial actions that would be another matter. But nothing in the Order so indicates and as stated above, there is at least a suggestion that the Commission expected collection actions to be administrative. *See, e.g., Ascom Communications, Inc. v. Sprint Communications, Inc.*, 15 F.C.C.R. 3223, 3237 (2000) (adjudicating a claim against Sprint for a violation of § 201(b)).

The dissent also invokes our decision in *MCI Telecommunications Corp. v. FCC*, 59 F.3d 1407 (D.C. Cir. 1995), but the holding of that case is too narrow to be of any help in this case. *MCI*, as well as the line of precedent on which it relied, did not involve Commission prescriptions in general, but rather referred specifically to ratemaking under § 205. *Id.* at 1414. The Commission's ratemaking power is expressly defined as the authority "to determine and prescribe what will be the *just and reasonable* charge." 47 U.S.C. § 205(a) (emphasis added). It is one thing to hold that when Congress instructs the Commission to set a "just and reasonable" rate for common carriers, their noncompliance with the rate will be considered "unjust and unreasonable"; it is quite another to extend that reasoning to encompass all Commission regulations governing

common carriers. In addition, *MCI* involved claims brought before the Commission -- not in a federal district court. When *MCI* is viewed in the new light of *Sandoval*, its value as a precedent in this case is diminished still further.

We do not say that the Commission has no power to interpret § 201(b) to encompass violations of its rules, and thereby to create private rights of action in courts when previously there were none. We do say the Commission did not attempt to exercise any such power here. Plaintiffs therefore cannot proceed under § 201(b).

### 3. Sections 407 and 416(c)

The plaintiffs next look to 28 U.S.C. §§ 407 and 416(c) to supply the right to sue the IXCs in federal court. Section 407 authorizes a "complainant" to petition the district court for damages based upon a carrier's failure "to comply with an order for the payment of money within the time limit in such order." The plaintiffs contend the regulation providing for dial-around compensation is such an "order."

In the alternative, the plaintiffs contend § 416(c), read in conjunction with §§ 206 and 207, gives them a right of action. That provision states, "It shall be the duty of every person ... to observe and comply with [every order of the Commission] so long as the same shall remain in effect." According to the plaintiffs, the compensation regulation is also an "order" within the meaning of § 416(c), and §§ 206 and 207 make the failure to comply therewith actionable in federal court.

The IXCs argue in response that the regulation at issue is not an "order" within the meaning of either § 407 or § 416(c) because that term, as used in those sections, includes only

Commission decisions arising out of an adjudicatory, as opposed to a rulemaking, proceeding. They argue that to interpret "order" to include rulemaking decisions makes no sense in light of § 416(a), which requires that every order be served upon the carrier's designated agent, and of § 416(b), which authorizes the Commission "to suspend or modify its orders upon such notice and in such manner as it shall deem proper."

We agree with the IXCs that "order" in §§ 407 and 416(c) refers only to adjudicatory and not to rulemaking decisions. Although the Communications Act does not define the term "order," the Administrative Procedure Act does: "'order' means the whole or part of a final disposition ... of an agency in a matter other than a rule making." 5 U.S.C. § 551(6). We recognize that the circuits are divided over the question whether "order" as used in § 401(b), a companion provision to those at issue here, includes a decision promulgated through rulemaking. The Ninth Circuit has held that it does, reasoning that "[w]hen Congress intended the APA's definition of a term to be incorporated into the Communications Act, it said so." *Hawaiian Tel. Co. v. Pub. Utilities Comm'n of Hawaii*, 827 F.2d 1264, 1271 (9th Cir. 1987); *see also Alltel Tennessee, Inc. v. Tennessee Pub. Serv. Comm'n*, 913 F.2d 305, 308 (6th Cir. 1990) (following *Hawaiian Tel. Co.* and citing cases from 4th, 5th, 7th, and 8th Circuits).

We are persuaded otherwise for the reasons laid out at length by then-Judge Breyer in *New England Telephone & Telegraph Co. v. Public Utilities Commission of Maine*, 742 F.2d 1, 4–9 (1st Cir. 1984) (relying in part upon APA definition of "order" in concluding § 401(b) is limited to "adjudicatory orders"). We are particularly convinced that, as the First Circuit said of that provision, making §§ 407 and 416(c) applicable to Commission regulations would "interfere seriously with the well

established principle that the 'enforcement' of the Communications Act is entrusted primarily to" the FCC, *id.* at 5, rather than to the district courts.

Further, the plaintiffs' reading of §§ 407 and 416(c) would render § 201(b) superfluous: any failure to comply with a regulation, not only unjust and unreasonable practices, would be a violation of the Act and therefore actionable under §§ 206 and 207. *See Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 489 n.13 ("It is ... a cardinal principle of statutory construction that a statute ought, upon the whole, be so construed that ... no clause, sentence, or word shall be superfluous, void, or insignificant"). And, to those provisions of § 416 that the IXCs correctly identify as inconsistent with the plaintiffs' broad interpretation of "order," we add § 415(f), the one year statute of limitations for filing a petition to enforce a Commission order for the payment of money. If orders included regulations, then a complainant would be able to seek enforcement of a regulation only for the first year after it is promulgated. That simply cannot be.

For these reasons, and because we agree entirely with the First Circuit's analysis in *New England Telephone and Telegraph*, we reject the plaintiffs' contention they can sue the IXCs pursuant to §§ 407 and 416(c).

## III. Conclusion

We hold that, as a result of the PSPs' valid assignment of their claims to the plaintiff aggregators, the aggregators have standing to sue the defendant IXCs for failing to pay the PSPs dial-around compensation as required by the regulation; that the aggregators have promised to pass back to the PSPs any recovery from the lawsuit is immaterial for the purpose of

determining their standing. We also hold that none of the provisions of the Act upon which the plaintiffs rely grants them the right to sue in federal court to recover dial-around compensation the IXCs are required by regulation to pay. The orders of the district court denying the IXCs' motion to dismiss are therefore

*Reversed.*

1

SENTELLE, *Circuit Judge*, *concurring in part and dissenting in part*: In considering whether the plaintiff aggregators have standing to sue, I, like the Court, begin with the same basic question: "We must . . . determine whether the aggregators have a stake in the outcome of the suit[.]" Maj. Op. at 7. Because I conclude that most of the aggregators do not have a concrete private interest in the outcome of this suit, I must respectfully dissent from Part II.A of the Court's opinion.[*]

The PSPs' assignment of rights to APCC is materially limited: "'[The PSP] hereby assigns, transfers, and sets over to [the aggregator] *for purposes of collection* all rights, title, and interest of [the PSP] in [the PSP's] claims, demands or causes of action' for dial-around compensation." What the Court sees as "a mere reflection" of a technical detail not affecting the substance of the relationship, I see as the first clue that the PSPs, not the aggregators, would be the only plaintiffs with a real stake in the outcome of this controversy.

The Supreme Court's statements on the "irreducible constitutional minimum" of standing, under Article III, are straightforward: first and foremost, the plaintiff "must have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical[.]" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (quotation marks, footnote, and internal citation omitted). Of course, as this Court recognizes, the party that actually suffered the injury in the first instance need not be the party to bring suit; under *Vermont Agency of Natural Resources v. United States ex rel.*

---

[*] As noted by the Court, Maj. Op. at 6 n.*, this discussion only applies to those plaintiff aggregators that do not own, wholly or in part, PSPs.

*Stevens*, an assignee of the injured party's claim may have standing to sue.  529 U.S. 765, 771-74 (2000).

The doctrine of assignee standing does not wholly erase the basic requirements of standing, however.  There are "assignments," and then there are assignments.  Only an assignment that gives the assignee an actual interest in the recovery is sufficient for standing.

The assignee standing doctrine recognized by the Supreme Court (and cited by this Court, Maj. Op. at 7) clearly refers to an actual assignment of an interest that secures a portion of the recovery.  *See Vermont Agency*, 529 U.S. at 773 ("The FCA can reasonably be regarded as effecting a partial assignment of the Government's damages claim.").  The cases cited in *Vermont Agency* as exemplifying "assignee standing" reflect this fact. *See Poller v. Columbia Broadcasting System, Inc.*, 284 F.2d 599, 602 (D.C. Cir. 1960), *rev'd*, 368 U.S. 464, 465 (1962) (plaintiff in antitrust suit was assignee of all of the assets of the dissolved corporation (of which he was previously the sole shareholder)); *Hazeltine Research, Inc. v. Automatic Radio Mfg. Co.*, 77 F. Supp. 493, 495 (D. Mass. 1948) (plaintiff in patent license suit was assignee of parent corporation's right to grant licenses under certain patents), *aff'd*, 176 F.2d 799 (1st Cir. 1949), *aff'd*, 339 U.S. 827 (1950); *Manhattan Trust Co. v. Sioux City & N. R. Co.*, 65 F. 559, 568 (N.D. Iowa 1895) (intervenor assignee in suit at equity was entitled to redeem securities pledged by assignor to third party, upon assignee's payment of the loan proceeds to that third party), *aff'd sub nom. Hubbard v. Tod*, 76 F. 905 (8th Cir. 1896), *aff'd*, 171 U.S. 474 (1898); *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 531 (1995) (plaintiff in contract dispute was subrogated *pro tanto* because, as injured party's insurer, it had paid injured party compensation that it would recover in contract parties'

3

arbitration); *Musick, Peeler & Garrett v. Employers Ins.*, 508 U.S. 286, 288 (1993) (plaintiff in stock fraud suit was subrogated because, as injured party's insurer, it had paid injured party compensation that it would recover in civil suit). *See also Titus v. Wallick*, 306 U.S. 282, 286 (1939), *quoted in* Maj. Op. at 10 (plaintiff assignee did have to account for the proceeds of the recovery and turn over the proceeds to the assignor, but assignor was obligated, under the terms of the assignment, "after paying the expenses of collection, to pay over one-half of the net recovery to [assignee's] wife, to discharge certain indebtedness of [assignee], and to pay the balance to [assignee].").

The cases cited in *Vermont Agency* as exemplifying the accepted doctrine of "assignee standing" share a common characteristic noticeably absent from the case before us: in each of those cases the "assignment" gave the putative plaintiff a direct share in the recovery. This necessary characteristic renders those cases consistent with *Vermont Agency*'s requirement that the putative plaintiff have "a concrete private interest in the outcome of the suit" in order to attain standing. 529 U.S. at 772 (quoting *Lujan*, 504 U.S. at 573) (quotation marks & brackets omitted).

Under *Vermont Agency* (consistent with its foundation, *Lujan*), an assignee plaintiff must both (1) seek to vindicate the injury to the assignor, and (2) hold an interest "consist[ing] of obtaining compensation for, or preventing, the violation of a legally protected right." *Vermont Agency*, 529 U.S. at 772-73. An assignment suffices for such an interest when the assignee actually receives the benefit of the compensation he receives. Where the "assignment" relationship is in substance a mere "agency" relationship such that the "assignee" enjoys no right to

keep a part of the recovery, the irreducible constitutional minimum of standing is left unsatisfied.

In this case, the putative plaintiffs themselves recognize that the PSPs' assignment of rights to aggregators such as APCC gives them no share in the recovery. "The aggregators' compensation for billing and collection services is based on the number of payphones and telephone lines operated by their PSP clients." Br. for Plaintiffs-Appellees at 5-6. The aggregators are a pass-through entity: "Aggregators are intermediaries between PSPs and IXCs for billing and collection. An aggregator . . . collects the IXCs' payments, and distributes those payments to its PSP clients." *Id.* at 5.

The contract cited by the Court reflects the pass-through nature of the "assignee-assignor" relationship. True, according to one part of the Agreement, the PSPs "assign[] . . . for purposes of collection" the interest in Company's claims. But we do not interpret the contract's individual phrases apart from the rest of the contract; rather, we interpret the agreement "as a whole," along with "all writings that are part of the same transaction." *See* RESTATEMENT (SECOND) OF CONTRACTS § 202(2) (1979). Doubts raised by the "for purposes of collection" language of that portion of the contract are confirmed by the Amendment to APCC Services Agency Compensation Agreement, which notes that, far from taking on the rights and responsibilities of the PSPs *en toto*, APCC merely acts as the "PSP's exclusive *agent for billing and collection*." Amendment at 1 (emphasis added). APCC does nothing more than "tak[e] collective action *on behalf of PSP* and other[s] . . . with similar claims." *Id.* (emphasis added). APCC's obligations to each PSP in this additional agreement stretch far beyond mere "obligat[ion] to account for the proceeds of a suit brought on the claim." Maj. Op. at 10.

As noted above, APCC has no actual financial interest in the recovery. The Amendment confirms this. APCC's compensation is determined by a schedule of variable fees determined by *current* PSP call volume, not the historical PSP call volume at issue in the case before us. APCC Services Agency Compensation Agreement, Schedule A. *See also* Sandusky Memo ("To fund the suits, all plaintiffs are being required to agree to a quarterly assessment of their dial around compensation on a per call basis."). True, if APCC's collection efforts require APCC to provide "additional services . . . over and above the services provided pursuant to the Agreement," APCC could deduct costs (again, based on current call volume) from the PSPs' recoveries, Amendment to APCC Services Agency Compensation Agreement at 2. But APCC has not alleged that such deductions are required in the present case, and we therefore have no occasion to determine whether such hypothetical deductions would be sufficient for standing.

The aggregators whose standing I find lacking advance an alternative theory that they have "associational standing." Associational standing requires three elements: first, the association's members must otherwise have standing to sue in their own right; second, the interest the association seeks to protect must be germane to its purpose; third, neither the claim asserted nor the relief requested must require the individual members to participate in the suit. *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). The aggregators assert that they meet each requirement and therefore have associational standing. I disagree.

An aggregator cannot have "associational standing," because an aggregator is not an "association." The assignors of rights to the aggregators do not thereby become members of the aggregators. Indeed, the aggregators have no members at all.

"In determining whether an organization that has no members in the traditional sense may nonetheless assert associational standing, the question is whether the organization is the functional equivalent of a traditional membership organization." *Fund Democracy, LLC v. SEC*, 278 F.3d 21, 25 (D.C. Cir. 2002). The aggregators are no such thing. APCC Services, Inc., Davel Communications Group, Inc., Data Net Systems, L.L.C., Intera Communications Corp., Jaroth, Inc., and NSC Telemanagement Corp. are all for-profit companies with contractual relationships with a number of other companies. One corporation does not become a member of another corporation by reason of entering into contracts with it. The aggregators are in no sense "membership organizations." They are not even "organizations." They are incorporated entities–legal persons–and their clients are no more their "members" than a law firm's clients are the firm's "members."

In sum, I would respond to the District Court's certified question for interlocutory appeal with instructions to dismiss the complaint with respect to the aggregators that do not own PSPs either in whole or in part. I therefore dissent, respectfully, from Part II.A of the opinion of the Court.

1

GINSBURG, *Chief Judge*, dissenting with respect to Section II.B.2 and to the judgment: Because I believe the plaintiffs have a right to pursue their claims for dial-around compensation under 47 U.S.C. § 201(b), I would affirm the order of the district court on that ground.

Section 201(b) provides in relevant part:

All charges, practices, classifications, and regulations for and in connection with [a] communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful .... The Commission may prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this chapter.

Sections 206 and 207 afford a private right of action based upon conduct made unlawful by chapter 5 of the Act. Section 201(b), which is in chapter 5, makes unlawful any "unjust or unreasonable" practice in connection with a communication service. It is undisputed that both IXCs and PSPs provide a "communication service," and that the Commission is charged with prescribing rules and regulations interpreting what is just and reasonable. *See* 47 U.S.C. § 201(b); *AT&T Corp. v. Iowa Utilities Bd.*, 525 U.S. 366, 378-79, 397 (1999). I agree with the plaintiffs that the IXCs' failure to pay dial-around compensation constitutes an "unjust and unreasonable practice" as the agency has interpreted that phrase.

In rejecting the plaintiffs' argument on that score, the court frames the question not as whether there is a private right of action under § 201(b), in conjunction with §§ 206 and 207, but where such an action is to be heard — in district court or before the Commission. According to the court, there is no indication

"the Commission in 1999 ... even thought about suits directly in district court" to recover for a violation of the regulation, slip op. at 16, and had the Commission made its intention known, "that would be another matter." *Id*. at 16–17. I disagree. It is not for the Commission to decide whether the plaintiffs may sue in federal court for a violation of the statute; the Congress has already made that determination. Section 207 provides that "any person claiming to be damaged by a common carrier['s]" violation of Chapter 5 "may either make complaint to the Commission ... or may bring suit ... in any district court of the United States of competent jurisdiction."

The PSPs allege the IXCs have violated § 201(b) by failing to pay the sums required by the dial-around compensation regulation. In promulgating that regulation the Commission invoked, in addition to § 276(b)(1)(A), its authority under §§ 201–205, *see In re Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, 14 F.C.C.R. 2545 ¶ 232 (1999). In its 2003 Report and Order on the regulation, the agency made express what had previously been implied, namely, that "failure to pay in accordance with the Commission's payphone rules, such as the rules expressly requiring such payment that we adopt today, constitutes both a violation of section 276 and an unjust and unreasonable practice in violation of section 201(b) of the Act." *Pay Telephone Reclassification and Compensation Provisions*, Report & Order, 18 F.C.C.R. 19975 ¶ 32 (2003). That is clearly an authoritative interpretation of § 201(b). The court can say "[t]here was no authoritative interpretation of § 201(b) in this case" only because it makes no mention of the 2003 Report and Order and fails to note that the Commission filed an amicus brief in this case advancing the same position. I disagree that the Commission has not exercised

its interpretive authority in this case; the question, as I see it, I whether its interpretation is correct.

The IXCs and the court claim that, if § 201(b) applies here, then a common carrier's violation of any regulation of the Commission could be said to constitute an unjust and unreasonable practice. I see no need to go so far, however, in order to uphold the agency's interpretation of § 201(b) with respect to this regulation. Indeed, I would simply reiterate what this court said a decade ago, namely, that when the Commission reasonably deems the failure of a common carrier to act in a specified way to be an unjust and unreasonable practice, a carrier that fails to comply with the Commission's prescription violates the Act. *See MCI Telecomms. Corp. v. FCC*, 59 F.3d 1407, 1414 (1995) ("We have repeatedly held that a rate-of-return prescription has the force of law and that the Commission may therefore treat a violation of the prescription as a *per se* violation of the requirement of the Communications Act that a common carrier maintain 'just and reasonable' rates"). Contrary to the suggestion of the IXCs, *Sandoval* does not instruct otherwise. As the Court there explained, it is "meaningless to talk about a separate cause of action to enforce" a regulation that authoritatively construes a statute. 532 U.S. at 284. "A Congress that intends the statute to be enforced through a private cause of action intends the authoritative interpretation of the statute to be so enforced as well." *Id*.

I find the IXCs' other arguments for rejecting the Commission's interpretation of § 201(b) equally unpersuasive. The IXCs maintain that § 201(b) does not apply here because it "relates [only] to the common carriers' provision of communication services to their customers," but they do not even purport to ground that limitation in the text. Nor is there any precedent supporting such a limitation. On the contrary,

4

both the Commission and this court have previously applied § 201(b) to one carrier's provision of a communication service to another carrier. *See MCI*, 59 F.3d at 1414 (§ 201(b) makes unlawful carrier's violation of agency regulation setting maximum rate-of-return for interstate access); *Ascom Communications, Inc. v. Sprint Communications Co.*, 15 F.C.C.R. 3223 (2000) (§ 201(b) makes unlawful carrier's attempt to collect from PSP for unauthorized and fraudulent calls placed from PSP's phones over carrier's network).

Sprint and AT&T next argue that § 201(b) applies only to the violation of a regulation, like the one at issue in *MCI*, promulgated exclusively pursuant to § 205 of the Act, which authorizes the Commission to set just and reasonable rates for services. I disagree — as does the Commission, which has invoked § 201(b) in several contexts to which § 205 does not pertain. *See*, *e.g.*, *Ascom*, 15 F.C.C.R. at 3227 ("we conclude that Sprint violated section 201(b) when it charged Ascom for certain calls for which Ascom was not a customer"); *In re Telephone Number Portability*, 18 F.C.C.R. 23697 n.76 (2003) ("we note that a violation of our number portability rules would constitute an unjust and unreasonable practice under § 201(b) of the Act"); *Core Communications, Inc. v. SBC Communications Inc.*, 18 F.C.C.R. 7568 ¶ 25 (2003) (failure to comply with merger conditions held an unjust an unreasonable practice). The IXCs offer no reason to believe the Commission may determine what constitutes an unjust or unreasonable practice only if, in doing so, it relies exclusively upon its authority under § 205. That limitation cannot be found in either § 201(b) or in § 205.

Having rejected each of the arguments raised by the IXCs, I see no reason to deem unreasonable the Commission's determination that it is an unjust and unreasonable practice for a common carrier to fail to pay PSPs as required by the

regulation. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984). The Congress delegated to the Commission the responsibility of prescribing "such rules and regulations as may be necessary in the public interest to carry out the provisions" of the Act, 47 U.S.C. § 201(b), and then specifically directed the Commission to establish a compensation plan that "fairly compensates" PSPs for dial-around calls. 47 U.S.C. § 276(b)(1)(A). The agency in turn set a rate for dial-around compensation that it believed to be "fair to both payphone owners and the beneficiaries of those calls" and to serve the public interest by ensuring "the widespread deployment of payphones." 14 F.C.C.R. 2545 ¶ 59. This court upheld the Commission's reasoning, so the justness and reasonableness of the rates is no longer open to challenge. *See APCC v. FCC*, 215 F.3d at 52. One would therefore be hard-pressed to say the Commission acted unreasonably when it deemed a common carrier's failure to pay just and reasonable compensation an unjust and unreasonable practice. *See Capital Network Sys., Inc. v. FCC*, 28 F.3d 201, 204 (D.C. Cir. 1994) ("Congress entrusted the administration of the Communications Act to the FCC .... Because 'just,' 'unjust,' 'reasonable,' and 'unreasonable' are ambiguous statutory terms, this court owes substantial deference to the interpretation the Commission accords them").

Accordingly, I would hold the plaintiffs may sue the defendant IXCs under § 201(b) for failure to comply with the Commission's regulation governing dial-around compensation, and would affirm the district court's order on that basis.